**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

KEVIN TRUDEAU and ALLIANCE PUBLISHING
GROUP, INC.,

                                        Plaintiffs,

        - v -                                                    Civ. No. 1:05-CV-1019
                                                                        (GLS/RFT)

NEW YORK STATE CONSUMER PROTECTION
BOARD; TERESA A. SANTIAGO, in her official
capacity; and JON SORENSEN, in his official capacity,

                                        Defendants.

**APPEARANCES:**                                **OF COUNSEL:**

JENNER, BLOCK LAW FIRM                          ANDREW A. JACOBSON, ESQ.
Attorneys for Plaintiffs                        DANIEL J. HURTADO, ESQ.
One IBM Plaza                                   DAVID J. BRADFORD, ESQ.
Chicago, IL 60611

JENNER, BLOCK LAW FIRM                          DANIEL MACH, ESQ.
Attorneys for Plaintiffs
601 Thirteenth Street, NW
12th Floor
Washington, D.C. 20005

MCNAMEE, LOCHNER LAW FIRM                       KEVIN LAURILLIARD, ESQ.
Attorneys for Plaintiffs                        WILLIAM A. HURST, ESQ.
677 Broadway
Albany, NY 12207

HISCOCK, BARCLAY LAW FIRM                       MICHAEL J. GRYGIEL, ESQ.
Attorneys for Plaintiffs
50 Beaver Street
Albany, NY 12207

WINSTON, STRAWN LAW FIRM                        LORI J. VAN AUKEN, ESQ.
Attorneys for Plaintiffs
200 Park Avenue
New York, NY 10166

HON. ELIOT SPITZER                          ROGER W. KINSEY, ESQ.
Attorney General for the State of New York   BRIDGET ERIN HOLOHAN, ESQ.
Attorney for Defendants                      JAMES B. MCGOWAN, ESQ.
The Capitol                                  Assistant Attorney Generals
Albany, NY 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

<u>**MEMORANDUM-DECISION and ORDER**</u>

## I.  INTRODUCTION

The Plaintiffs, Kevin Trudeau and Alliance Publishing Group, Inc., make a Motion to

Amend their Complaint to add another Plaintiff, Shop America (USA) L.L.C., another Defendant,

Caroline Quartararo, Deputy Executive Director of the Consumer Protection Board ("CPB"), claims

for monetary damages against Teresa Santiago, Caroline Quartararo, and John Sorensen in their

individual capacities for acts undertaken in their official capacities, state law defamation claims

against Santiago, Sorensen, and Quartararo, and in the alternative, pursuant to 42 U.S.C. § 1983,

defamation claims against Santiago, Sorensen, and Quartararo in violation of the First and

Fourteenth Amendments, and lastly, claims for tortious interference against Santiago, Sorensen, and

Quartararo.  Dkt. No. 59, Daniel J. Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl.

at ¶¶ 2, 13, 16, 68-91, & 98-169.  Plaintiffs also bring a Motion to Supplement their Complaint

whereby they seek to add a cause of action against Santiago, Quartararo, and Sorensen, in their

individual capacities, for violations of the First Amendment with regard to a letter that may have

been sent to producers of the Oprah Winfrey Show.  Dkt. Nos. 67, Mot. to Supplement & 69, Daniel

J. Hurtado Decl., dated Jan. 31, 2006, Ex. 1, Proposed Supplemental Compl.  Defendants oppose

both Motions on the basis of futility.  Dkt. Nos. 61, Defs.' Opp'n to Mot. to Am. at pp. 2, 11 & 16,

& 70, Defs.' Opp'n to Mot. to Supplement at pp. 3-13.

For the reasons set forth below, Plaintiffs' Motion to Amend is **granted in part and denied in part**, and Plaintiffs' Motion to Supplement is **granted in part and denied in part**.

**_____A.  Procedural Background**

On August 11, 2005, a Complaint was filed in this matter based upon the allegation that the New York State Consumer Protection Board threatened to contact certain television stations in regards to Plaintiff Trudeau's book entitled "Natural Cures 'They' Don't Want You to Know About."  Dkt. No. 1, Compl. at ¶¶ 3 & 6-9.  That same day, in conjunction with the filing of the Complaint, a Motion for a Temporary Restraining Order ("TRO") was filed by Plaintiffs.  Dkt. No. 2, TRO.  Because of Plaintiffs' failure to comply with the Federal Rules of Civil Procedure and the Local Rules for the Northern District of New York, the application for a TRO was denied without prejudice.  *See* Text Order, dated Aug. 15, 2005.  Then on August 16, 2005, an Emergency Motion for TRO was filed.  Dkt. No. 6.  Defendants opposed such Motion.  Dkt. Nos. 13-14.  The Hearing was set for August 30, 2005, and Defendants were told to "refrain from contacting broadcasting stations regarding plaintiffs' subject advertisement and maintain the status quo until the hearing." Deadlines for Mot., dated Aug. 17, 2005.  At the Hearing on August 30, 2005, the Honorable Gary L. Sharpe, United States District Judge, denied the Motion for TRO.  Oral Order, dated Aug. 30, 2005.

On August 31, 2005, Plaintiffs filed a Motion for Preliminary Injunction and a Motion for TRO.  Dkt. No. 17.  That same day, Plaintiffs' application for the TRO was granted as follows:

1. The defendants are hereby enjoined from directly contacting any cable or broadcast station in order to induce such station to refuse to carry, or cease to carry, plaintiffs' advertisements for the Natural Cures book authored by Kevin Trudeau; and 2. The

defendants are hereby enjoined from publishing or disseminating the letter attached as Exhibit A to the TRO application, or any letter substantially similar in content, as a means of indirectly contacting cable or broadcast stations (see "Dear cable station/broadcast station,"); ***however***, 3. Nothing in the language of this TRO shall operate to preclude defendants from communicating with the public concerning the views expressed by the State Consumer Protection Board[.]

Dkt. No. 20, Order, dated Aug. 31, 2005 at pp. 2-3.

The Hearing for the application for a Preliminary Injunction was scheduled for September 6, 2005. *Id.* at p. 3. On September 1, 2005, Defendants filed a Cross Motion to Dismiss and Opposition to the Motion for Preliminary Injunction. Dkt. No. 25. On September 5, 2005, Plaintiffs filed an Emergency Motion for TRO to *Restore the Status Quo*. Dkt. No. 37. At the Hearing on September 6, 2005, Judge Sharpe granted Plaintiffs' Motion for a Preliminary Injunction consistent with the language in the initial order and denied the Defendants' Cross Motion to Dismiss. Oral Order, dated Sept. 6, 2005; *see also* Dkt. No. 42, Minute Entry, dated Sept. 6, 2005. The Hearing for the Emergency Motion for TRO to *Restore the Status Quo* was scheduled for September 27, 2005, and on that date, Judge Sharpe denied Plaintiffs' application. Dkt. No. 58, Minute Entry, dated Sept. 27, 2005.

On October 5, 2005, Plaintiffs filed their Motion for Leave to Amend and Supplement the Complaint. Dkt. Nos. 59 & 62. Defendants opposed said Motion. Dkt. No. 61. Plaintiffs also sought to bring a motion to supplement but since Defendants did not consent, a telephone conference was held by this Court whereby Plaintiffs were given permission to file the motion. Text Order, dated Jan. 31, 2006. Plaintiffs filed their Motion to Supplement the Complaint on January 31, 2006, Dkt. Nos. 67 & 68, and this Motion was opposed by Defendants as well, Dkt. Nos. 70 & 71.

**B.  Motion to Amend Facts**

The following facts are adduced from the Proposed Amended Complaint.  In September 2004, Plaintiff Trudeau settled a lawsuit with the Federal Trade Commission ("FTC") whereby he agreed to produce and appear in infomercials to only promote books and other informational publications.  Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl. at ¶ 21.  Trudeau is an author and has appeared in several infomercials promoting his book on "Natural Cures" which is critical of government agencies and their health policies.  *Id.* at ¶ 3.  Before the infomercials aired, the FTC reviewed the manuscript and subsequent manuscripts of the "Natural Cures" book as well as videotapes of the infomercial.  *Id.* at ¶ 22.  There was no objection to the book or infomercial by the FTC.  *Id.* at ¶¶ 5 & 22.  The FTC stated that the infomercial is "an expression of opinion protected by the First Amendment."  *Id.* at ¶ 5.  These infomercials discuss the relationship between the FTC, the Food and Drug Administration ("FDA"), and the pharmaceutical industry along with Trudeau's views on disease and health by focusing on healthy lifestyles and natural remedies.  *Id.* The infomercials are run on cable and broadcast networks.  *Id.* at ¶ 4.  To date, approximately 3.5 million copies of Trudeau's book have been sold and the infomercial has aired for ten months.  *Id.* at ¶ 23.

On or about July 12, 2005, the New York State Consumer Protection Board contacted Plaintiffs about the "Natural Cures" book and stated it intended to issue a press release regarding the book.  *Id.* at ¶¶ 6, 24, & 27.  The CPB had received two consumer complaints about the book, thus initiating an inquiry into the book.  *Id.* at ¶ 6.  On August 5, 2005, the CPB sent a press release about the content of the book and also accused Trudeau of placing false endorsements on the cover and that Trudeau has been subjected to fraud and/or civil contempt charges with regards to "the

Snorenz, Fat Trapper Plus and Exercise in a bottle." *Id.* at ¶¶ 7 & 27, Ex. B, Press Release.  On

August 6, 2005, an article was published by the Associated Press, due in part to the CPB's press

release, entitled "Cure-all book leads to fraud charges, warnings, but infomercials still run." *Id.* at ¶

31, Ex. C, Press Release by Associated Press.  The Associated Press stated that the CPB sought to

ask "cable stations to pull the ad[.]" *Id.* at ¶ 32.

On the afternoon of August 6, 2005, Plaintiffs' counsel emailed Defendant Sorensen seeking

to confirm whether the CPB sought to have cable stations pull the infomercial.  *Id.* at ¶ 33.

Plaintiffs' counsel also inquired as to which stations had been contacted.  *Id.*  Defendant Sorensen's

reply was that none had been contacted "yet."  *Id.*  Then on August 8, 2005, Plaintiffs' counsel

wrote to Defendant Sorensen, once again, stating that should the CPB take the action contemplated,

contacting the television stations, Plaintiffs' counsel would request an in-person meeting and an

opportunity for judicial redress prior to any action the CPB would take.  *Id.* at ¶ 34, Ex. D, Bradford

Lt., dated Aug. 8, 2005.  On August 10, 2005, after receiving no response, Plaintiffs' counsel

emailed Sorensen stating that if they did not receive assurance that no contact with the stations

would be made, then legal action would be pursued.  *Id.* at ¶ 35, Ex. E, Bradford Email, dated Aug.

10, 2005.  On the evening of August 10, a response was received from Sorensen which indicated

that contact with the stations was not precluded; Plaintiffs' counsel returned an email advising

Sorensen that if no commitments were made by 1:00 p.m. Eastern Standard Time by August 11,

2005, to refrain from further action without providing Plaintiffs with three days notice, Plaintiffs

would seek redress from the courts.  *Id.* at ¶ 36.  Since no response was received, the Complaint was

filed.  *Id.* at ¶ 37.

On or about August 31, 2005, the day Plaintiffs filed their Motion for Preliminary Injunction

and Motion for TRO, but prior to the Court's ruling on the TRO, the CPB sent approximately one hundred and two (102) letters to cable and broadcast stations in order to have the infomercials taken off the air. *Id.* at ¶¶ 8 & 45.  The letter had been signed by Defendant Santiago.  *Id.*  The letter stated that a combined 431 complaints were received regarding the infomercials and book.  *Id.* at ¶ 46.  Approximately fifteen stations did take the infomercial off the air.  *Id.* at ¶¶ 8 & 56.  However, the CPB would not identify which stations the letters were sent.  *Id.* at ¶ 48.  Upon receiving a list of the stations as a result of a Motion to Compel that had been filed on September 13, 2005, Plaintiffs' counsel sent letters to each of the stations to prevent further damage.  *Id.* at ¶¶ 52-55.  Plaintiffs believe that had they not sent those letters, many more stations would have removed the infomercial which has caused the loss of book sales and loss of audiences from the infomercial.  *Id.* at ¶ 56.

### C.  Motion to Supplement Facts

In addition to the facts set forth above, the following facts are disseminated from the Proposed Motion to Supplement.  Plaintiff Trudeau pursued appearances on nationally televised programs, including but not limited to the Oprah Winfrey Show, to promote his book.  Hurtado Decl., dated Jan. 31, 2006, Ex. 1, Proposed Supplemental Compl. at ¶ 172.  On or about October 7, 2005, Defendant Sorensen, with the participation and/or consent of Defendants Santiago and Quartararo, sent a letter to producers of the Oprah Winfrey Show.  *Id.*, Ex. H, Oprah Lt.  This letter advised the producers that Dr. My Haley, whose endorsement appears on the book, was concerned that Trudeau had been misrepresenting Dr. Haley's views on the book.  *Id.*  The letter also stated that the CPB was conducting an investigation into consumer complaints, false endorsements, and misleading advertisements of the book.  *Id.*  The letter did not mention that the preliminary injunction was granted nor that the CPB was enjoined from sending letters to stations in regards to

the book. *Id.* at ¶ 175. Since then, Trudeau has not been able to secure an appearance on the Oprah Winfrey Show. *Id.* at ¶ 176.

## II.  DISCUSSION

### A.  Standard for Motion to Amend

FED. R. CIV. P. 15(a) states, in pertinent part, that leave to amend a pleading should be "freely given when justice so requires." Indeed, leave to amend should be denied only in the face of undue delay, bad faith, undue prejudice to the non-movant, futility of amendment, or where the movant has repeatedly failed to cure deficiencies in previous amendments. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Kropelnicki v. Siegel*, 290 F.3d 118, 130 (2d Cir. 2002) (citing *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 271-72 (2d Cir. 1996)). District courts are vested with broad discretion to grant a party leave to amend the pleadings. *See Local 802, Assoc. Musicians of Greater New York v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998). "The party opposing a motion for leave to amend has the burden of establishing that granting such leave would be unduly prejudicial." *New York v. Panex Indus., Inc.*, 1997 WL 128369, at *2 (W.D.N.Y. Mar. 14, 1997) (citing *Saxholm AS v. Dynal, Inc.*, 938 F. Supp. 120, 123 (E.D.N.Y. 1996)); *see also Lamont v. Frank Soup Bowl*, 2000 WL 1877043, at *2 (S.D.N.Y. Dec. 27, 2000) (citations omitted). This requires the non-movant to "do more than simply claim to be prejudiced." *Bryn Mawr Hosp. v. Coatesville Elec. Supply Co.*, 776 F. Supp. 181, 185 (E.D. Pa. 1991).

### B.  Standard for Motion to Supplement

FED. R. CIV. P. 15(d), states in part, that "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the

pleading sought to be supplemented." The standard to determine whether to grant leave to amend is similar to that exercised on a motion for leave to file a supplemental pleading. Absent "undue delay, bad faith, dilatory tactics, undue prejudice to the party to be served with the proposed pleading, or futility, the motion should be freely granted." *Interpublic Group of Companies, Inc. v. Fratarcangelo*, 2002 WL 31720355, at *1 (S.D.N.Y. Dec. 4, 2002) (quoting *Foman v. Davis*, 371 U.S. at 182).

### C. Futile or Meritless Amendment

As stated above, the district court is required to grant leave to amend "freely . . . when justice so requires." FED. R. CIV. P. 15(a); *Foman v. Davis*, 371 U.S. at 182; *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990). However, the court has the discretion to deny a motion to amend especially on the grounds of futility. *Nettis v. Levitt*, 241 F.3d 186, 193 (2d Cir. 2001); *see also Marchi v. BOCES*, 173 F.3d 469, 478 (2d Cir. 1999) (citing *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993)); *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990).[1] The Second Circuit has stated where futility is raised as an objection to the motion to amend, and

> [w]here it appears that granting leave to amend is unlikely to be productive, it is not an abuse of discretion to deny leave to amend. *See, e.g.*, *Foman v. Davis*, 371 U.S. at 182, 83 S.Ct. at 230 (denial not abuse of discretion where amendment would be futile); *Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir.1990) ("where . . . there is no merit in the proposed amendments, leave to amend should be denied"); *Billard v. Rockwell International Corp.*, 683 F.2d 51, 57 (2d Cir.1982) (denial not abuse of discretion where plaintiff had had "access to full discovery" in a related case).

*Ruffolo v. Oppenheimer & Co.*, 987 F.2d at 131.

As futility is an appropriate basis for denying leave to amend, such denial should be

---

[1] The Second Circuit has stated that the district court does not abuse its discretion, as long as there is good cause, when they deny leave to amend pleadings on the basis of futility, bad faith, undue delay or undue prejudice. *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101-02 (2d Cir. 2002) (denying leave to amend when motion was initiated four years after original complaint and when more than three years had passed since the close of discovery); *see also Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).

contemplated within the standards necessary to withstand a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6).  *Dougherty v. North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).

### D.  Motion to Amend

### 1.  Monetary Damages in the Individual Capacity

Plaintiffs seek to add claims for monetary damages against Santiago, Sorensen, and Quartararo in their individual capacities for violations of Plaintiffs' First Amendment rights undertaken in their official capacities.  Dkt. No. 59, Pls.' Mem. of Law on Mot. to Am. at pp. 10-11. Defendants claim such amendment would be futile as the Defendants are entitled to qualified immunity.  Dkt. No. 61, Defs.' Mem. of Law on Mot. to Am. at pp. 3-11.

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend. XI.  The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity.  *Huang v. Johnson*, 251 F.3d 65, 69 (2d Cir. 2000).  The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the "real, substantial party in interest."  *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.*, 506 U.S. 139, 142-47 (1993) & quoting *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984)).  Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities."  *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003).  However, the Eleventh Amendment will not extend to a suit against state officials in their individual capacities, even when

the conduct complained of was carried out in accordance with state law. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Therefore, Defendants can be sued in their individual capacities in a claim for money damages.

Although Plaintiffs may sue Defendants in their individual capacities, Defendants raise the issue of qualified immunity as to the First and Fourteenth Amendment claims.[2] Defs.' Mem. of Law in Opp'n to Pls.' Mot. to Am. at pp. 3-11.

Qualified immunity will shield "government officials from liability for civil damages when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 359 (2d Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Mollica v. Volker*, 229 F.3d 366, 370 (2d Cir. 2000). This also applies "insofar as it was objectively reasonable for [the government officials] to believe that their acts did not violate those rights." *Mollica*, 229 F.3d at 370 (internal quotation marks and citations omitted); *see also Anderson v. Creighton*, 483 U.S. 635, 641 (1987). The objectively reasonable test will be met "'if [officials] of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (further citation omitted)).

In order for the constitutional right to be clearly established, three elements must be met: "1) . . . [that] the right in question [be] defined with reasonable specificity; 2) [that] the decisional law of the Supreme Court and applicable circuit court support the existence of the right in question; and

---

[2] The First and Fourteenth Amendment claims were asserted in the original Complaint against the CPB and Santiago and Sorensen, in their official capacities, but did not seek monetary relief against Defendants Santiago, Sorensen, and Quartararo in their individual capacities. *See* Dkt. No. 1, Compl. at ¶¶ 35-46.

3) [that] under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Mollica*, 229 F.3d at 371 (internal quotation marks and citations omitted) (alterations in original).

However, the Second Circuit has stated that in regards to a qualified immunity defense, even though a plaintiff may "ultimately be unable to prevail because of that defense . . . [t]hat possibility is not a valid basis for denying leave to amend the complaint . . . for such immunity is an affirmative defense that the defendants have the burden of raising in their answer and establishing at trial or on a motion for summary judgment." *Oliver Sch. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)); *see also Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 141 (2d Cir. 1999); *Black v. Coughlin*, 76 F.3d 72, 75 (2d Cir. 1996). Moreover, "the defense of qualified immunity cannot support the grant of a . . . 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983); *see also McKenna v. Wright*, 386 F.3d 432, 435 (quoting *Green*). An exception to this general rule exists where the complaint itself sets up, on its face, the qualified immunity defense; in such an occassion, dismissal for failure to state a claim would be appropriate. *Roniger v. McCall*, 22 F. Supp. 2d 156, 162 (S.D.N.Y 1998) (citing *Green v. Maraio*, 722 F.2d at 1019); *see also McKenna v. Wright*, 386 F.3d at 435.

Therefore, Plaintiffs Motion to Amend is **granted** on this issue and they may bring suit for monetary damages against Santiago, Sorensen, and Quartararo in their individual capacities despite the qualified immunity defense.

**2.  State Law Defamation Claim**

Plaintiffs further seek to add state law defamation claims against Santiago, Sorensen, and

Quartararo.  Pls.' Mem. of Law in Supp. of Mot. to Am. at pp. 11-16; Dkt. No. 62, Pls.' Reply

Mem. of Law in Supp. of Mot. to Am. at pp. 8-9.  Defendants claim that they are entitled to absolute

and/or qualified immunity on the state law defamation claim.  Defs.' Mem. of Law on Mot. to Am.

at pp. 13-16.  In addition, Defendants claim Plaintiffs have, in part, failed to state a cause of action.

*Id.* at p. 16.

As noted above, the qualified immunity defense is not a valid basis for denying leave to

amend the complaint.  However, there may be a different result for absolute immunity

which"applies only to a limited class of officials and functions."  *Spear v. Town of West Hartford*,

954 F.2d 63, 66 (2d Cir. 1991) (citations omitted) (extending absolute immunity to executive branch

of a municipality).  Courts must examine the "nature of the function performed" in assessing

whether absolute immunity will attach.[3]  *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348,

357 (2d Cir. 2004) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)).  Whether a government

official receives absolute immunity depends upon "the scope of the delegated discretion and

whether the position entails making decisions of a judicial nature - i.e., decisions requiring the

application of governing rules to particular facts, an exercise of reasoned judgment which could

typically produce different acceptable results."  *Id.* at 364 (internal quotation marks and citations

omitted).

In the context of defamation claims, absolute immunity "extends to any official who 'is a

---

[3] Juxtaposed to absolute immunity, qualified immunity requires an affirmative demonstration of fats to support
it.  *Black v. Coughlin*, 76 F.3d at 75-76 (in some case, the defense cannot be decided as a matter of law).  The Second
Circuit has held that qluaified immunity "turns on factual questions that cannot be resolved at [the motion to dismiss]
stage of proceedings."  *Taylor v. Vermont Dep't of Ed.*, 313 F.3d 768, 793 (2d Cir. 2002).  For these reasons, any
adjudication as to the applicability of the qualified immunity affirmative defense would be premature since "[r]esolution
of qualified immunity depends on the determination of certain factual questions that cannot be answered at this stage of
the litigation."  *Denton v. McKee*, 332 F. Supp. 2d 659, 666 (S.D.N.Y. 2004); *see supra* Part I.D.1.

principal executive of State or local government or is entrusted by law with administrative or

executive policy-making responsibilities of considerable dimension,' provided the allegedly

defamatory statements were made during the discharge of official responsibilities and concerned

matters that come within the ambit of those duties." *A.F.C. Enters. v. New York City Sch. Constr.*

*Auth.*, 2001 WL 1335010, at *12 (E.D.N.Y. Sept. 6, 2001) (quoting *Stukuls v. New York,* 366

N.E.2d 829 (1977)).  In addition, this privilege will also be available "to those of subordinate rank

who exercise delegated powers." *Id.* (quoting *Ward Telecomm. & Comp. Servs., Inc. v. New York,*

366 N.E.2d 840 (1977)).  However, "where defamation is alleged, New York reserves absolute

immunity for those at the highest echelons of government[.]" *Hayes v. Sweeny*, 961 F. Supp. 467,

482 (W.D.N.Y. 1997) (citing *Stukuls v. New York*, 366 N.E.2d at 831-33).

      In this case, Defendant Santiago is the "Chairperson and Executive Director of the CPB, and

. . . is responsible for setting policy for the CPB[.]"  Hurtado Decl., dated Oct. 5, 2005, Ex. 2,

Proposed Am. Compl. at ¶ 15.  It is abundantly clear that the chairperson and executive director of

the CPB, Santiago, is entrusted by law with administrative or executive policy-making

responsibilities of considerable dimension.  *See* N.Y. EXEC. LAW §§ 551 & 553.  The executive

director also has the authority to "assign appropriate functions to any such [organizational] unit and

may appoint such staff, agents and consultants as he [or she] may deem necessary and prescribe

their duties[.]"  *Id.* at § 552.  The only remaining question then is whether the allegedly defamatory

statements were made during the discharge of Santiago's official responsibilities and concerned

matters within the ambit of those duties.  Plaintiffs state that Santiago "published, on the CPB

website and in letters, false and defamatory statements" concerning false endorsements on the

book's back cover, complaints received by consumers, that Trudeau had been held in civil contempt

regarding other products, and a court found the infomercial about the book to be misleading.

Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl. at ¶ 100.

Pursuant to N.Y. Exec. Law § 553(2), the executive director has the power and duty to, in

part:

a. receive complaints of consumers and refer them to the appropriate federal, state or local agency authorized by law for appropriate action on such complaints; and
b. advise and make recommendations to the governor on matters affecting the consumers of the state and promote and encourage the protection of the legitimate interests of consumers within the state[.]

In addition, the executive director, at the direction of the board, has the power and duty to:

a. conduct investigations, research, studies and analyses of matters affecting the interests of consumers;
b. cooperate with and assist the attorney general in the carrying out of his legal enforcement responsibilities for the protection of consumers;
c. cooperate with and assist consumers in class actions in proper cases;
d. represent the interests of consumers of the state before federal, state and local administrative and regulatory agencies;
e. study the operation of consumer protection laws and recommend to the governor new laws and amendments of laws for consumer protection;
f. conduct product research and testing and, where appropriate, contract with private agencies and firms for the performance of such services;
g. initiate and encourage consumer education programs;
h. cooperate with and assist local governments in the development of consumer protection activities;
i. establish advisory councils to assist in policy formulation on specific consumer problems; and j. undertake activities to encourage business and industry to maintain high standards of honesty, fair business practices, and public responsibility in the production, promotion and sale of consumer goods and services.

N.Y. Exec. Law § 553(3).

Here, Santiago is afforded broad powers to not only refer complaints to the appropriate

authorities, but also to conduct investigations and "undertake activities to encourage business

industry to maintain high standards of honesty, fair business practices, and public responsibility in

the production, promotion and sale of consumer goods and services." Yet, this language does not

clarify the actions the executive director may take to fulfill those goals.  Despite the fact that the

actions taken by Santiago may have been made during the discharge of her official responsibilities,

it is unclear at this juncture if those actions concerned matters within the ambit of her duties.  Hon.

Gary Sharpe, District Judge, in issuing his decision of Plaintiffs' Motion for a Preliminary

Injunction, stated that New York State's issuance of press releases is "the State's right to free speech

. . . that it has on behalf of and for the benefit of those folks they feel they're protecting."  Dkt. No.

70, Bridget Holohan Affirm., Hr'g Tr., dated Sept. 6, 2005, at p. 86.  However, Judge Sharpe also

noted that it was not clear whether those releases and/or letters could be sent directly to cable

companies as the cable companies might view them as coercive.  *Id.* at pp. 86-87.  Moreover, N.Y.

EXEC. LAW § 553 does not discuss either publishing on the CPB website and/or in letters those

complaints the CPB has received by consumers about certain products or the means by which the

executive director or any subordinates may provide cautionary advice to media outlets regarding

those same products.  It is not readily apparent, and thus a question of fact, that Santiago was acting

within her delegated executive policy duties to which absolute immunity would attach.  *Stukuls v.*

*New York*, 366 N.E.2d at 834.  Therefore, absolute immunity cannot attach to Santiago at this point.

Defendant Quartararo, Deputy Executive Director, and Sorensen, Director of Marketing and

Public Relations, " [are also] responsible for setting policy for the CPB[.]"  Hurtado Decl., dated

Oct. 5, 2005, Ex. 2, Proposed Am. Compl. at ¶¶ 16 & 17.  As for Defendants Quartararo and

Sorensen, being the Deputy Executive Director and Director of Marketing and Public Relations

respectively, it may be that they are "those of [a] subordinate rank who exercise delegated powers"

since the executive director has full authority to assign functions and prescribe duties.  *See* N.Y.

EXEC. LAW § 552.  However, it is also unclear at this time whether any duties were delegated to

these two Defendants by Santiago.  Even if the duties were delegated to these individuals, it is questionable whether Santiago took action that was within the ambit of her duties. As the immunity provided to subordinates is derivative of the executive director's immunity, which has not been established, likewise it has not been established that Quartararo and Sorensen are entitled to absolute immunity as well.

Thus, the Motion to Amend will not be denied on the grounds of absolute immunity as to Defendants Santiago, Quartararo, and Sorensen.

Defendants claim that if neither absolute nor qualified immunity is established, then the only Plaintiff who has stated a defamation cause of action is Trudeau and the only Defendant against whom the cause of action exists is Santiago.  Defs.' Mem. of Law on Mot. to Am. at p. 16.

Pursuant to New York law, the elements of defamation include: "(1) a false and defamatory statement of fact, (2) 'of and concerning' the plaintiff, (3) the publication of statements to a third party, and (4) injury to the plaintiff." *Excellus Health Plan, Inc. v. Tran*, 287 F. Supp. 2d 167, 173-74 (W.D.N.Y. 2003) (citing, *inter alia*, *Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 61 (2d Cir. 1993)); *see also Robinson v. Town of Colonie*, 878 F. Supp. 387, 408 (N.D.N.Y. 1995).

Defendants, in essence, have conceded that Trudeau has alleged a cause of action against Defendant Santiago.  However, Defendants state that none of the alleged defamatory statements were made against Plaintiffs Alliance Publishing and Shop America and that no statement was uttered by Sorensen or Quartararo.  Defs.' Mem. of Law in Supp. of Mot. to Am. at p. 16.

In determining whether a statement made was "of and concerning" a plaintiff, "the court must consider whether those who know the plaintiff, upon reading the statements, would understand that the plaintiff was the target of the allegedly libelous statement." *Excellus Health Plan, Inc. v.*

*Tran*, 287 F. Supp. 2d at 174 (citing *Cardone v. Empire Blue Cross and Blue Shield*, 884 F. Supp. 838, 847 (S.D.N.Y. 1995)) (further citation omitted).  Consequently, the plaintiff "alleging defamation need not be named in the publication, but in order to recover, that party must sustain the burden of pleading and proving that the defamatory statement referred to him or her." *Id.* (citing *Chicherchia v. Cleary*, 616 N.Y.S.2d 647, 648 (N.Y. App. Div., 2d Dep't 1994)).  In addition, "[t]he reference to the party alleging defamation may be indirect and may be shown by extrinsic facts.  But where extrinsic facts are relied upon to prove such reference the party alleging defamation must show that it is reasonable to conclude that the publication refers to him or her and the extrinsic facts upon which that conclusion is based were known to those who read or heard the publication." *Id.* (citing *Chicherchia v. Cleary*, 616 N.Y.S.2d at 648).

Here, as to Plaintiffs Alliance Publishing and Shop America, L.L.C., neither one of these Plaintiffs were mentioned by name in the press release of August 5, 2005, nor the letter signed by Quartararo or Santiago.  Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl. at ¶ 27, Exs. B, Press Release, dated Aug. 5, 2005, F, Quartararo Lt., & G, Santiago Lt.  Though the press release refers explicitly to Trudeau, the only other reference made in the release is to the "marketing machine."[4]  *Id.*  The alleged defamatory statements made about the complaints received by CPB, the fraud charges with respect to other products, and the book jacket inferentially could be associated with the "marketing machine."  Thus, as it is possible that those who know Plaintiffs Alliance Publishing and Shop America, L.L.C., upon reading the statements, would understand that the

---

[4] Despite the fact that the Preliminary Injunction Motion only addressed the coercive nature of the letter signed by Santiago and sent to the stations, for purposes of the defamation cause of action, Plaintiffs seem to include the press release as defaming Plaintiffs as they state in their Proposed Amended Complaint that Defendants "published, on the CPB website and in letters, false and defamatory statements concerning Plaintiffs[.]"  Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl. at ¶¶ 100, 119, & 138.

Plaintiffs were the target of the allegedly libelous statement and since "extrinsic facts may be necessary to show that the words relate to" Plaintiffs, Plaintiffs have articulated facts that could fulfill the second element of the defamation cause of action. *Angio-Medical Corp. v. Lilly & Co.*, 720 F. Supp. 269, 273 (S.D.N.Y. 1989) (citing *Harwood Pharmacal Co. v. Nat'l Broad. Co.*, 174 N.E.2d 602, 603-04 (N.Y. Ct. of App. 1961)) (further citations omitted).  And since that press release was seemingly "published" by Sorensen, Plaintiffs may bring the cause of action against Sorensen.  *See* Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl., Ex. B, Press Release, dated Aug. 5, 2005.

However, the ambiguous reference to the "marketing machine" is not made in the letter possessing Defendant Quartararo's signature and that particular letter was not sent to the cable and broadcast stations or any other third party as we know.  Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl., Ex. F, Quartararo Lt.  Moreover, that letter only discussed Plaintiff Trudeau. *Id.*  Though this letter was sent in a modified version to cable and broadcast stations, the modified letter was signed by Santiago; thus it was not specifically "published" by Quartararo.  *Id.*, Ex. G, Santiago Lt.  Plaintiffs, nevertheless, claim that liability may be imputed upon a defendant if he or she took "part in the procurement, composition and publication [of the defamatory statement.]" Dkt. No. 62, Pls.' Reply Mem. of Law in Supp. of Mot. to Am. at p. 9.  Pursuant to New York law, "all who take part in the procurement, composition and publication of a libel are responsible in law and equally so[.]" *Treppel v. Biovail Corp.*, 2005 WL 2086339, at *3 (S.D.N.Y. Aug. 30, 2005) (quoting *Brown v. Mack*, 56 N.Y.S.2d 910, 916 (N.Y. Sup. Ct. 1945)).  However, a claim for defamation will not "survive without an allegation that [a] defendant[] participated in the creation or the publication of the statements at issue."  *Id.* (citing, *inter alia*, *Mahoney v. Staffa*, 681 N.Y.S.2d

*-19-*

816, 817-18 (N.Y. App. Div., 3d Dep't 1998)).  In this case, Plaintiffs have alleged that Quartararo did partake in the procurement, composition, or publication of defamatory statements.  Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl. at ¶¶ 41, 117-124; Pls.' Reply Mem. of Law in Supp. of Mot. to Am. at p. 9.  Moreover, Defendants acquiesce to the alleged defamation cause of action against Santiago whose "modified" letter was sent to the cable and broadcast stations. Comparing Quartararo's draft letter with Santiago's delivered letter, which are very similar, it is plausible that Quartararo participated in the creation or publication of the statements at issue.

Plaintiffs have alleged facts as to the third and fourth elements.[5]  In regards to the third element, the alleged defamatory statements were made in writing as exhibited by the press release and letter signed by Santiago.  With regards to the fourth element, Plaintiffs have alleged injuries by claiming that stations removed the infomercial from the air, that there was injury to their reputation, and that the sales and revenue from the Natural Cures book have suffered.  Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl. at ¶¶ 56, 105, 124, & 143.

Accordingly, Plaintiffs Motion to Amend is **granted** as to the state law defamation claims.

### 3.  Section 1983 Defamation Claim

In the alternative to the state law defamation claims, Plaintiffs bring, pursuant to 42 U.S.C. § 1983, defamation claims against Santiago, Sorensen, and Quartararo in violation of the First and Fourteenth Amendments.  Pls.' Mem. of Law in Supp. of Mot. to Am. at pp. 11-16; Pls.' Reply

---

[5] As a general proposition of law, when a corporation pleads a cause of action in defamation, it must allege special damages, unless the allegations are "so defamatory in nature as to directly affect [the] credit and occasion pecuniary injury."  *Harwood Pharmacal Co. v. Nat'l Broad. Co.*, 174 N.E.2d 602, 603 (N.Y. 1961); *see also El Meson Espanol v. NYM Corp.*, 521 F.2d 737 (2d Cir. 1975); *Drug Research Corp. v. Curtis Pub. Co.*, 166 N.E.2d 319, 322 (N.Y. 1960) (citing *New York Soc. for Suppression of Vice v. McFadden*, 183 N.E. 284, 286 (N.Y. 1932) for the proposition that "if the accusation impeaches the integrity or business method of the corporat[ion] itself, no special damages need be shown").

Mem. of Law in Supp. of Mot. to Am. at pp. 7-8. Defendants claim that Plaintiffs have failed to state a cause of action and that in the event this Court finds a claim has been stated, then they are entitled to qualified immunity. Defs.' Mem. of Law in Opp'n to Mot. to Am. at pp. 11-13.

The Second Circuit has stated that "[d]efamation . . . is an issue of state law, not of federal constitutional law, and therefore provides an insufficient basis to maintain a § 1983 action." *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004) (citing *Lauro v. Charles*, 219 F.3d 202, 207 (2d Cir. 2000)) (further citation omitted). However, "the 'stigma plus' doctrine [will] in limited circumstances provide[] a remedy for government defamation under federal constitutional law." *Id.* (citing *Paul v. Davis*, 424 U.S. 693, 701-10 (1976)). Thus, in order to establish a "stigma plus" claim, a plaintiff must show: 1) "the utterance of a statement 'sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false,' and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Id.* (quoting *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001)) (further citations omitted). This "burden or alteration of status must be '*in addition* to the stigmatizing statement.'" *Id.* (quoting *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d at 47) (emphasis in original).

Although a plaintiff's allegations may be adequate to show "a government-imposed stigma, such defamation is not, absent more, a deprivation of a liberty or property interest protected by due process." *Id.* (citing *Siegert v. Gilley*, 500 U.S. 226, 233 (1991) & *Morris v. Lindau*, 196 F.3d 102, 114 (2d Cir. 1999) (defining the term "stigma plus" as the "loss of reputation coupled with some other tangible element")); *see also Valmonte v. Bane,* 18 F.3d 992, 1001 (2d Cir. 1994) (noting that "the impact that defamation might have on job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation" are not sufficient to

-21-

meet the "plus" prong of the test).  Thus, "[i]f the [liberty] interest . . . assert[ed] is not of a constitutional dimension, then [the] argument[] fails."  *Fox v. Duran*, 974 F. Supp. 276, 281 (S.D.N.Y. 1997) (citing *Board of Regents v. Roth*, 408 U.S. 564, 570-71 (1972)).  The Second Circuit has further stated that "[b]urdens that can satisfy the 'plus' prong under this doctrine include the deprivation of a plaintiff's property, *Greenwood v. New York, Office of Mental Health*, 163 F.3d 119, 124 (2d Cir. 1998), and the termination of a plaintiff's government employment, *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004)."  *Sadallah v. City of Utica*, 383 F.3d at 38. Notwithstanding that other circuits have held that "direct interference with a plaintiff's business may also constitute a "plus" under this doctrine," the Second Circuit has held that "'deleterious effects [flowing] directly from a sullied reputation,' standing alone, do not constitute a 'plus' under the 'stigma plus' doctrine."  *Id.* (quoting *Valmonte v. Bane*, 18 F.3d at 1001 & citing *WMX Techs., Inc. v. Miller*, 197 F.3d 367, 375 (9th Cir. 1999)) (alteration in original).

In this case, it must be determined if the three Plaintiffs can establish not only the "stigma" element of the cause of action but also the "plus" element as required.  First, Plaintiffs must show that Defendants Santiago, Sorensen, and Quartararo uttered statements that were sufficiently derogatory to injure the Plaintiffs' reputations, that Plaintiffs are capable of proving the statements made were false, and that they allege the statements are false.[6]  Plaintiffs claim that Defendants Santiago, Sorensen, and Quartararo uttered the following statements, which to them are sufficiently derogatory to injure their reputation, and which they believe they are capable of proving false: 1)

---

[6] Plaintiffs' causes of action against Santiago, Sorensen, and Quartararo for the state law defamation claims expressly asserted the defamatory statements were derived from the CPB website, where the press release is located, and from the letter, whereas the "stigma plus" cause of action only refers to the letter.  Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl. at ¶¶ 100, 119, & 138.

"the CPB, FTC and the Better Business Bureau have received at least 431 complaints regarding the Natural Cures book; and 2) the Court found the Natural Cures infomercial to be misleading and thus authorized the dissemination of the CPB's letter to cable and broadcast stations regarding the infomercial."  Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl. at ¶ 109.  Plaintiffs note that these statements are not inclusive of the defamatory statements made in the letter sent to the stations.  *Id.*  However, these statements plus any others relayed in the letter would not be sufficiently derogatory to injure the reputation of either Alliance Publishing or Shop America, L.L.C., because, as noted previously, the letter signed by Defendant Santiago did not mention or make any reference to these two Plaintiffs and merely focused on Plaintiff Trudeau.  It was only in the press release "published" by Sorensen where the "marketing machine" had been mentioned.  Plaintiffs only assert that the "letters" published by the CPB contain the defamatory statements for this cause of action and do not refer to the press release.  *Id.* at ¶¶ 109, 128, & 147.  Therefore, it is clear that Plaintiffs Alliance Publishing and Shop America, L.L.C., have not satisfied the first element of the "stigma plus" cause of action.  In addition, since Sorensen's involvement and name appears only on the press release and not the letter distributed to the cable and broadcast stations, no cause of action exists against Sorensen.[7]

As for Plaintiff Trudeau and Defendants Santiago and Quartararo,[8] assuming that the statements made were defamatory, that they could be proven false, and that there are claims that the statements are false, the Court must now assess whether facts are alleged to show there was a

---

[7] The Court also notes that while a person may be held liable for the procurement, composition, or publication under the New York State law defamation claim, that particular notion is not grounded in federal law, under which the "stigma plus" claim resides.  Therefore, the claim against Sorensen would not stand.

[8] Quartararo remains a player in this cause of action because, as mentioned previously, the letters signed by Quartararo and Santiago were very similar and, thus, the statements might have been "uttered" by both parties.

material state-imposed burden or state-imposed alteration of Plaintiff Trudeau's status or rights as

encompassed by the "plus" element.  This plus element must include a deprivation of a liberty or

property interest.  Plaintiff Trudeau states that there has been a deprivation of his liberty interest in

free speech under the First Amendment and that, in addition, there was also the deprivation of a

property interest which includes lost sales revenues.  *Id.* at ¶¶ 112, 116, 131, 135, 146, & 154; Pls.'

Reply Mem. of Law in Supp. of Mot. to Am. at p. 7.

   With regard to the liberty interest asserted, "[l]iberty denotes 'not merely freedom from

bodily restraint but also the right of the individual to contract, to engage in any of the common

occupations of life, to acquire useful knowledge . . . and generally to enjoy those privileges long

recognized . . . as essential to the orderly pursuit of happiness by free men.'"  *Cohane v. Greiner*,

2006 WL 625842, at *6 n.4 (W.D.N.Y. Mar. 10, 2006) (quoting *Meyer v. Nebraska*, 262 U.S. 390,

399 (1923)).  Even if the Court were to accept Plaintiff's statement that freedom of speech under the

First Amendment constitutes a liberty interest, the claim that this liberty interest constitutes the

"plus" prong must fail because the liberty interest asserted is not "*in addition*" to the stigma, which

is, in effect, the defamatory statement.  *Sadallah v. City of Utica*, 383 F.3d at 38.  It is exactly the

statements made by the government in the letter that Plaintiff claims are defamatory and violate his

First Amendment right of free speech.  Plaintiff cites to *Sadallah v. City of Utica*, 383 F.3d 34, 38

(2d Cir. 2004), for the proposition that the "plus" element can be established when a "government

agent goes beyond merely damaging reputation and 'directly interferes' with a plaintiff's business."

Pls.' Reply Mem. of Law on Mot. to Am. at p. 8.  However, examples of direct government

interference include termination of employment, revocation of leases, revocation of a license to

engage in a business, and seizure of property.  *Sadallah v. City of Utica*, 383 F.3d at 39 (citing

*-24-*

*Cypress Ins. Co. v. Clark*, 144 F.3d 1435, 1437-38 (11th Cir. 1998) & *Marrero v. City of Hialeah*, 625 F.2d 499, 513-14 (5th Cir. 1980)); *see also O'Neill v. City of Auburn*, 23 F.3d 685, 691(2d Cir. 1994).  Here, interference with First Amendment rights, and as explained below, loss of sales revenue, do not rise to the level of direct government interference as shown by the examples provided above.

As for the loss of revenue from sales of the Natural Cures book, Plaintiff has also failed to establish the "plus" element.  The loss of revenue can be viewed as a deleterious effects flowing directly from a sullied reputation, and as such, would not constitute a "plus" under the "stigma plus" doctrine.  *See Barber v. Winn*, 1997 WL 151999, at *4 (N.D.N.Y. Mar. 31, 1997) (stating that the loss of potential business resulting from a sullied reputation would constitute "negative deleterious effects . . . flow[ing] directly from a sullied reputation" (citation omitted)).  It is a clear connection that since Plaintiff Trudeau brings a claim for defamation, a consequence of which would affect his reputation, that some form of loss to his business could occur as a result.

Despite the fact that Plaintiff Trudeau has satisfied the "stigma" prong of the "stigma plus" cause of action, Plaintiff has failed to establish the "plus" prong as no facts could be alleged that would sustain the cause of action.  Thus, the Motion to Amend is **denied** as to the "stigma plus" cause of action.[9]

## 4.  Tortious Interference

Plaintiff Shop America seeks to bring claims of tortious interference against Santiago, Sorensen, and Quartararo.  Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl. at ¶¶

---

[9] Nevertheless, had Plaintiff established a "stigma plus" claim, qualified immunity would not have been a valid basis for denying leave to amend the complaint.  *Oliver Sch. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)); *see supra* Part I.D.1.

155-69.  Defendants claim that Plaintiff has failed to state a cause of action as to the tortious

interference with contract claims.  Defs.' Mem. of Law in Opp'n to Mot. to Am. at pp. 16-17.

However, Plaintiffs' Reply to the Motion to Amend states that Plaintiff Shop America's claim is for

tortious interference with a business relationship and not tortious interference with a contract.  *See*

Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl. at ¶¶ 155-169; Pls.' Reply Mem. of

Law on Mot. to Am. at pp. 9-10.

      In order to state a claim for tortious interference with a business relationship under New

York law, the following conditions must be established: "(i) the plaintiff had business relations with

a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted

for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts

injured the relationship."  *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d

Cir. 2003) (quoting *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir. 2002)).

      To satisfy the first element of tortious interference with a business relationship, the claim

"must specify some particular, existing business relationship through which plaintiff would have

done business but for the allegedly tortious behavior."  *Minnesota Mining & Mfg. Co. v. Graham-*

*Field, Inc.,* 1997 WL 166497, at *7 (S.D.N.Y. Apr. 9, 1997) (quoting *Kramer v. Pollock-Krasner*

*Found.*, 890 F. Supp. 250, 258 (S.D.N.Y. 1995)); *see also  PPX Enters., Inc. v. Audiofidelity*

*Enters., Inc.*, 818 F.2d 266, 269 (2d Cir. 1987); *Envirosource, Inc. v. Horsehead Resource Dev. Co.*,

1996 WL 363091, at *14 (S.D.N.Y. July 1, 1996) (stating that "[a] general allegation of interference

with customers without any sufficiently particular allegation of interference with a *specific contract*

*or business relationship* will not withstand a motion to dismiss." (emphasis in original)) (quoting

*McGill v. Parker*, 582 N.Y.S.2d 91, 95 (N.Y. App. Div., 1st Dep't 1992)); *Winner Int'l v.*

*Kryptonite Corp.*, 1996 WL 84476, at *4 (S.D.N.Y. Feb. 27, 1996) (noting that "[a]s Winner does not allege that Kryptonite's conduct interfered with its business relationship with any specific party, it cannot establish the elements necessary for this tort").  Plaintiff Shop America claims there is a valid business relationship between Shop America and cable and broadcast stations, and for purposes of this Motion, this fact must be accepted as true since the motion to dismiss standard is applicable.  Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl. at ¶¶ 156, 161, & 166. Plaintiff Shop America is a direct marketing company that "markets the Natural Cures book via infomercials[.]"  *Id.* at ¶ 13.  Here, Plaintiff states that the CPB's letter about Natural Cures was sent to one hundred two (102) stations and that approximately fifteen (15) total stations removed the Natural Cures infomercial from the air.  Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl. at ¶ 56.  Although the exact stations are not named, a defect that could be readily cured, there was an obvious existing relationship with certain cable and broadcast stations that aired the Natural Cures infomercial.  Thus, the first element has been satisfied to the extent that Plaintiff Shop America had existing business relationships with specific stations which Plaintiff Shop America would have done business with but for the allegedly tortious behavior.

In order to satisfy the second requirement, the defendant must interfere with the business relationship directly; "that is, the defendant must direct some activities toward the third party and convince the third party not to enter into a business relationship with the plaintiff."  *Black Radio Network, Inc. v. NYNEX Corp.*, 2000 WL 64874, at *4 (S.D.N.Y. Jan. 25, 2000) (cited in *Interboro Packaging Corp. v. G.P. Plastics Corp.*, 2003 WL 21403807, at *1 (S.D.N.Y. June 18, 2003)); *see also Allcar Motor Parts Corp. v. Federal-Mogul Corp.*, 1998 WL 671448, at *5 (S.D.N.Y. Sept. 29, 1998) (citing *Fonar Co., v. Magnetic Resonance Plus, Inc.*, 957 F. Supp. 477, 482 (S.D.N.Y. 1997)

& *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2d Cir. 1995)).  Plaintiff Shop America

claims that Defendants Santiago, Sorensen, and Quartararo interfered with its relationship with the

stations when a letter, signed by Defendant Santiago, was sent to the cable and broadcast stations

that described complaints received by the CPB as well as disclaimer language and other such

material.  Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl. at ¶¶ 45-47, Ex. G,

Santiago Lt.  Although Santiago's signature appears on the letter, Plaintiff Shop America states that

Defendants Sorensen and Quartararo are liable because they "had knowledge of the business

relationship" and "intentionally interfered with or procured the breach of those business

relationships[.]"  *Id.* at ¶¶ 162-63 & 167-68.  As to Defendant Sorensen, a press release was placed

on the CPB website on August 5, 2005, asking Plaintiff Trudeau to pull his "ad," but it did not ask

cable or broadcast stations to pull the ad.[10]  *Id.* at ¶ 27, Ex. B, Press Release, dated Aug. 5, 2005.

Apparently, however, the Associated Press, based "at least in part on the CPB's August 5, 2005

press release," published an article reporting that the CPB was asking cable stations to pull the ad.

*Id.* at ¶¶ 31-32, Ex. C, Buffalo News Article, dated Aug. 6, 2005.  In addition, Sorensen

corresponded with Plaintiffs' attorneys through letters in regards to the contemplation of the CPB

contacting cable stations in order to get them to discontinue further advertising for the book.  *Id.* at ¶

34, Ex. D, Lt. by Bradford, dated Aug. 8, 2005.  Emails were also sent back and forth between

Sorensen and Plaintiffs' attorneys as to whether the CPB intended to notify cable stations about

Plaintiff Trudeau's book.  *Id.* at ¶¶ 35-36, Ex. E, Email, dated Aug. 10, 2005.  However, Sorensen

---

[10] It should be noted that Preliminary Injunction Motion initiated by Plaintiffs only referred to the letter sent to the stations as coercive and not the August 5th press release.  *See* Dkt. No. 70, Bridget Holohan Affirm., Hr'g Tr., dated Sept. 6, 2005, at pp. 13-15, 22-23, 41-43, & 55.  Judge Sharpe, furthermore, did not address any possible coerciveness resulting from the press release.  *Id.* at pp. 78-87.

did not interfere with the business relationships directly since no direct contact was made between

Sorensen and the stations.  With regard to Defendant Quartararo, a copy of a letter signed by

Quartararo seemingly intended for cable and broadcast stations was provided to Plaintiffs' attorneys

in conjunction with the Motion for a Preliminary Injunction.  *Id.* at ¶ 41, Ex. F, Quartararo Lt.

Although that particular letter was never sent to the stations, a "modified version" of Quartararo's

letter was sent to 102 stations with Santiago's signature.  *Id.* at ¶ 45, Ex. G, Santiago Lt.  Thus, since

the "modified version" was sent, Quartararo did not interfere with the business relationships

directly.  In this instance, it would seem that only Defendant Santiago may be liable at best because

she sent the letter, signed by her, directly to the cable and broadcast stations possibly to convince the

stations not to enter into a business relationship with Plaintiff Shop America.  Sorensen's August 5th

press release and emails to Plantiffs' attorneys do not constitute direct interference with the business

relationships as neither were directed specifically towards the stations.

The standard for the third element has been addressed by the New York State Court of

Appeals.[11]  That court stated that the interference with business relations "must be 'more culpable'

than that required where the tortious interference is with a binding contract."  *Henneberry v.*

*Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 468 (S.D.N.Y. 2006) (quoting *Carvel Corp. v.*

*Noonan*, 818 N.E.2d 1100, 1103 (N.Y. 2004)).  Thus, as a general proposition, "the conduct must

amount to a crime or an independent tort, or must be engaged in 'for the sole purpose of inflicting

intentional harm on plaintiffs.'"  *Id.* (quoting *Carvel Corp. v. Noonan*, 818 N.E.2d at 1103).  The

Second Circuit also noted that "wrongful means" defined under New York law is "physical

---

[11] The Second Circuit had certified the question of what conduct constituted "improper means" or a "wrongful purpose" to the New York State Court of Appeals for the purpose of defining the third element of the tortious interference with business relations cause of action.  *See Carvel Corp. v. Noonan*, 350 F.3d 6, 23 (2d Cir. 2003).

violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; . . . however, [it does not] include persuasion alone although it is knowingly directed at interference with the [business relationship]." *Scutti Enters. v. Park Place Entm't Corp.*, 322 F.3d at 216 (quoting *NBT Bancorp v. Fleet/Norstar Fin. Group*, 644 N.E.2d 492, 497 (N.Y. 1996)); *see also Unique Sports Generation, Inc. v. LGH-III, LLC*, 2005 WL 2414452, at *7 (S.D.N.Y. Sept. 30, 2005); *A & A Jewellers Ltd. v. Bogarz, Inc.*, 2005 WL 2175164, at *2 (W.D.N.Y. Sept. 7, 2005).

Here, Plaintiff Shop America has alleged that Defendant Santiago made defamatory statements about Natural Cures when a letter was sent to cable and broadcast stations.  Hurtado Decl., dated Oct. 5, 2005, Ex. 2, Proposed Am. Compl. at ¶¶ 45-47, Ex. G, Santiago Lt.; *see supra* p. 16.  This would be considered an independent tort under New York State law.  Accordingly, taking Plaintiff Shop America's allegations as true per the motion to dismiss standard, which is also the standard when futility has been raised, the facts alleged are sufficient to show that Defendant Santiago may have made defamatory statements with the intent to interfere with business relationships between Plaintiff Shop America and the cable and broadcast stations. Viewed in this light, these allegations adequately plead the third element of Plaintiff Shop America's claim under New York law.

The final element to be established is whether Defendant Santiago's actions injured the business relationship.  As noted previously, several stations ceased airing the Natural Cures infomercial after the letter signed by Santiago was sent to numerous cable and broadcast stations.

*Id.* at ¶ 56.[12]  This injury to the relationship is sufficient to satisfy the final element.

Therefore, Plaintiff Shop America may amend its Complaint to add a cause of action for tortious interference with a business relationship as to Defendant Santiago only.

### E.  Motion to Supplement

Plaintiff Trudeau seeks to add claims against Defendants Santiago, Quartararo, and Sorensen, in their personal capacities, for violations of his First Amendment rights by preventing him from appearing on the Oprah Winfrey Show.  Hurtado Decl., dated Jan. 31, 2006, Ex. 1, Proposed Supplemental Compl at ¶¶ 172-99.  Plaintiff claims that the violation occurred when Sorensen, "with the participation and/or consent" of Santiago and Quartararo, sent a letter to the producers of the Oprah Show regarding an investigation into complaints about the book as well as other issues.  *Id.*

### 1.  Local Rule Compliance

Defendants state that Plaintiffs' Motion to Supplement fails to comply with Northern District of New York Local Rule 7.1(a)(4) and, thus, the Motion should be denied.  Dkt. No. 70, Defs.' Mem. of Law in Opp'n to the Mot. to Supplement at p. 3.  Plaintiffs state they have fully complied with Local Rule 7.1(a)(4).  Dkt. No. 74, Pls.' Reply Mem. of Law in Supp. of the Mot. to Supplement at pp. 1-2.

Local Rule 7.1(a)(4), entitled "Motions to Amend or Supplement Pleadings or for Joinder or Interpleader," states in part:

An unsigned copy of the proposed amended pleading must be attached to a motion

---

[12] Plaintiff Shop America also states that the interference "resulted in damages including but [not limited to] lost profits on book sales."  *Id.* at ¶ 159.  However, this statement is inapposite to establishing the fourth element as the interference must injure the relationship, not result in damages such as lost profits.

brought under FED. R. CIV. P. 14, 15, 19-22. Except as the Court otherwise provides, the proposed amended pleading must be a complete pleading, which will supercede the original pleading in all respects. No portion of the prior pleading shall be incorporated into the proposed amended pleading by reference. . . . Where leave to supplement a pleading is sought under FED. R. CIV. P. 15(d), the proposed supplemental pleading must be limited to transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. The paragraphs in the proposed pleading must be numbered consecutively to the paragraphs contained in the pleading that is to be supplemented.

Plaintiffs are under the mistaken notion that because the Motion to Supplement was filed as opposed to a motion to amend, which has also been filed by Plaintiffs, that only a portion of the rule was to be followed. Plaintiffs may have failed to comply with the Local Rule 7.1(a)(4) as it states that no portion is to be incorporated by reference, which Plaintiffs have done in their Proposed Motion to Supplement.[13] The requirement to provide a complete pleading applies whether the pleading was a motion to amend or to supplement, as the title of the rule infers. The Motion to Supplement may therefore be rejected for failing to comply with the Local Rules. *See Donato v. Senkowski*, 2000 WL 33743377, at *1-2 (N.D.N.Y. Oct. 31, 2000). However, in light of the fact this rule could easily have been misunderstood, in the interest of justice, and pursuant to this Court's discretion, the Court will nevertheless address the merits of the Motion to Supplement.[14]

---

[13] Once again, the third paragraph of Local Rule 7.1(a)(4) states "[w]here leave to supplement a pleading is sought under FED. R. CIV. P. 15(d), the proposed supplemental pleading must be limited to transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. The paragraphs in the proposed pleading must be numbered consecutively to the paragraphs contained in the pleading that is to be supplemented." This paragraph is meant to clarify the difference between a motion to supplement and a motion to amend. However, the pleading requirements for both types of motions remain the same. As stated in the first and second paragraphs of Local Rule 7.1(a)(4), each pleading must be a complete pleading, no portion of the prior pleading is to be incorporated by reference, and a red-lined version of the pleading must be provided to the Court. At this juncture, the Court must note that Plaintiffs did not submit a red-lined version of the Motion to Supplement. Nevertheless, Plaintiffs may have misunderstood the applicability of the first two paragraphs of this Rule to the Motion to Supplement.

[14] This Court feels confident based upon the review of Defendants' opposition that they were not mislead, misinformed, or prejudiced by Plaintiffs' non-compliant Proposed Supplemental Complaint.

**2.  First Amendment Claim**

Plaintiff Trudeau alleges that his First Amendment rights were violated when Defendant Sorensen, "with the participation and/or consent of Defendants Santiago and Quartararo, sent a letter . . . to the producers of the Oprah Winfrey Show" ("Oprah letter") advising the producers of the investigation into complaints regarding the book, false endorsements on the book cover, and misleading advertising for the book.  Hurtado Decl., dated Jan. 31, 2006, Ex. 1, Proposed Supplemental Compl. at ¶ 172; Pls.' Reply Mem. of Law in Supp. of the Mot. to Supplement at p. 2. Plaintiff attributes his failure to appear on the Oprah Winfrey Show to this letter.  Hurtado Decl., dated Jan. 31, 2006, Ex. 1, Proposed Supplemental Compl. at ¶ 176.  Defendants assert that Plaintiff Trudeau has failed to state a cause of action, and, in the alternative, that Defendants are entitled to qualified immunity.  Defs.' Mem. of Law in Opp'n to the Mot. to Supplement at p. 3.

In Judge Sharpe's ruling on the Preliminary Injunction, Judge Sharpe analyzed Plaintiff Trudeau's First Amendment right of free speech under the context of commercial speech.[15] Holohan Affirm., Hr'g Tr., dated Sept. 6, 2005, at pp. 78-87.  As the Oprah letter is similar in nature to the letter addressed in the Preliminary Injunction Motion, this Court will proceed to analyze Plaintiff's speech as if it were commercial.

The Supreme Court has set forth a four-part analysis when considering whether commercial speech may be validly restricted and warrant First Amendment protection.  The commercial speech "must [first] concern lawful activity and not be misleading" and second, the government must assert a substantial interest to be achieved by the restriction.  *Cent. Hudson Gas & Elec. Corp. v. Public*

_____

[15] Judge Sharpe did not decide whether the infomercial was core or hybrid speech as there was no dispute that it was commercial speech.  Holohan Affirm., Hr'g Tr., dated Sept. 6, 2005, at pp. 83-86.

*Serv. Comm'n*, 447 U.S. 557, 566 (1980); *Anderson v. Treadwell*, 294 F.3d 453, 460-61 (2d Cir.

2002).  If both inquiries are answered in the affirmative, then the court must determine third,

"whether the regulation directly advances the governmental interest asserted" and fourth, whether

the regulation "is not more extensive than is necessary to serve that interest." *Cent. Hudson Gas &*

*Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. at 566; *Anderson v. Treadwell*, 294 F.3d at 461.[16]

   The Second Circuit has also stated that "oral or written statements made by public officials

could give rise to a valid First Amendment claim where comments of a government official can

reasonably be interpreted as intimating that some form of punishment or adverse regulatory action

will follow the failure to accede to the official's request." *Okwedy v. Molinari*, 333 F.3d 339, 342-

43 (2003) (quoting *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983) & further

citing *Rattner v. Netburn*, 930 F.2d 204, 208 (2d Cir. 1991)).  This can be so "even if the public-

official defendant lacks direct regulatory or decisionmaking authority over the plaintiff or a third

party that facilitates the plaintiff's speech." *Okwedy v. Molinari*, 333 F.3d at 340-41.  In fact, the

Second Circuit has noted that "[w]hat matters is the distinction between attempts to convince and

attempts to coerce.  A public-official defendant who threatens to employ coercive state power to

stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the

threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory

or decisionmaking authority over the plaintiff, or in some less-direct form." *Id.* at 344.

   Here, with regards to the Oprah letter, Plaintiff claims that the infomercial and promotion of

his book are lawful activities and are not misleading.  Hurtado Decl., dated Jan. 31, 2006, Ex. 1,

---

[16] Judge Sharpe analyzed the Santiago letter under the *Central Hudson* four-part inquiry.  Holohan Affirm., Hr'g Tr., dated Sept. 6, 2005, at pp. 79-83.

Proposed Supplemental Compl. at ¶¶ 172-75.  The government, in turn, sought to inform the producers of the Oprah Winfrey Show about the infomercial regarding the Natural Cures book by providing the August 5, 2005 press release, the CPB's investigation into consumer complaints, and other possible misleading information.  Defs.' Mem. of Law in Opp'n to the Mot. to Supplement at p. 6.  Defendants further claim that the Oprah letter was only a cover letter for the press release.  *Id.* However, since Plaintiff Trudeau stated his activities were lawful and not misleading and thus the first two elements of the four-part test were answered in the affirmative, this Court must move to the final two elements.  Defendants state that the Oprah letter was purely informative and not coercive in any manner whereas Plaintiff Trudeau alleges that the letter "intimates that allowing Trudeau on the show or carrying Trudeau's infomercials may result in negative consequences at the hands of a government agency."  *Id.* at pp. 6-8; Pls.' Reply Mem. of Law in Supp. of the Mot. to Supplement at p. 6.  Plaintiff Trudeau further claims that since the Oprah letter was sent, he has been unable to secure an appearance on the show.  Hurtado Decl., dated Jan. 31, 2006, Ex. 1, Proposed Supplemental Compl. at ¶ 176.

In addition, the letter presented to the Oprah Show was written by a government official and even though the CPB has no regulatory power, it is within the realm of possibility that the letter may be interpreted as intimating some kind of adverse action.  *See Okwedy v. Molinari*, 333 F.3d at 340-41 & 342-43.  It is not for this Court to decide whether the letter could be considered coercive. Rather, the Court must only determine whether taking Plaintiff's allegations as true, Plaintiff has stated a cause of action.[17]  Thus, the Court should not dismiss the claim unless it appears beyond a

---

[17] To reiterate the standard, when futility is raised, as it is here by Defendants, the Court must assess the claim per the motion to dismiss standard.  *See supra* Parts II.B. & C.

doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to

relief.  In this case, Plaintiff has alleged some facts that may support his claim.  However, the letter

sent to the Oprah Show was authored by Defendant Sorensen and does not make any reference

whatsoever to Defendant Quartararo.  *Id.*, Ex. H, Oprah Letter.  Furthermore, the only reference to

Defendant Santiago is that her name appears on the letterhead as being the Chairperson of the CPB.

*Id.*  Plaintiff's only allegations as to Defendants Quartararo and Santiago are that, "upon information

and belief" they may have participated in and/or consented to Defendant Sorensen's letter that was

sent to the Oprah Winfrey Show.  Unlike in the state law defamation claim whereby others could be

held liable sans direct participation, Plaintiff has failed to provide nor could we find any caselaw to

establish that Quartararo and Santiago should be held liable for the letter authored by Sorensen

under a First Amendment claim.[18]  *See supra* p. 18.

As to the qualified immunity defense, the standard by which the Court must analyze the

Motion to Supplement is the same as in a motion to amend.  The Second Circuit has held that the

qualified immunity defense is not a valid basis for denying leave to amend the complaint.  *Oliver*

*Sch. v. Foley*, 930 F.2d 248, 253 (2d Cir. 1991) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

The same should apply to a motion to supplement.  Therefore, Plaintiff's cause of action will not be

denied on the grounds of qualified immunity.

Accordingly, Plaintiff Trudeau's Motion to Supplement is **granted in part** as to the First

Amendment claim against Defendant Sorensen only.

_____

[18] In a case similar to the one at hand, the Second Circuit, in *Hammerhead Enter., Inc. v. Brezenoff*, dealt with a First Amendment claim resulting from a letter sent by a mayor to certain stores about a board game that elicited many negative reactions.  707 F.2d 33 (2d Cir. 1983).  The Circuit's only mention of possible participation of other city officials was discussed within the section that dealt with claims of defamation as well as tortious interference with contracts and not within the context of the First Amendment claim.  *Id.* at 41 n.11.

## III.  CONCLUSION

For the reasons stated herein, it is hereby

**ORDERED**, that the Motion to Amend (Dkt. No. 59) be **GRANTED IN PART** and **DENIED IN PART**; and it is further

**ORDERED**, that the Motion to Supplement (Dkt. Nos. 67-69) be **GRANTED IN PART** and **DENIED IN PART**; and it is further

**ORDERED** that Plaintiffs shall file and serve its Amended Complaint, which shall incorporate the Supplemental Complaint, **on or before June 2, 2006**;

**ORDERED** that the Defendants' Answer to the Amended Complaint shall be filed and served within twenty days of the service of the Amended Complaint upon them.

**IT IS SO ORDERED.**

Date:   May 4, 2006
        Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge

-37-